[Cite as *Stonebridge Neighborhood Assn., Inc. v. Knapinksi*, 2018-Ohio-424.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MIAMI COUNTY**

| | | |
|---|---|---|
| STONEBRIDGE NEIGHBORHOOD ASSOCIATION, INC. | : | |
| | : | |
| | : | Appellate Case No. 2017-CA-9 |
| *Plaintiff-Appellee* | : | |
| | : | Trial Court Case No. 2015-CV-544 |
| v. | : | |
| | : | (Civil Appeal from |
| GREGORY J. KNAPINSKI, et al. | : | Common Pleas Court) |
| | : | |
| *Defendants-Appellants* | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 2nd day of February, 2018.

. . . . . . . . . . .

JONATHAN S. ZWEIZIG, Atty. Reg. No. 0069381, 18 East Water Street, Troy, Ohio 45373
     Attorney for Plaintiff-Appellee

JEREMY M. TOMB, Atty. Reg. No. 0079664, PATRICK J. JANIS, Atty. Reg. No. 0012194, 124 West Main Street, Troy, Ohio 45373
     Attorneys for Defendants-Appellants

. . . . . . . . . . . . .

TUCKER, J.

{¶ 1} Defendants-appellants, Amy L. Knapinski and Gregory J. Knapinski, appeal from the trial court's entry of March 8, 2017, in which the court issued its final judgment resolving a lawsuit under R.C. 5312.13 in favor of Plaintiff-appellee, Stonebridge Neighborhood Association, Inc. ("SNA"). Presenting two assignments of error, Appellants argue that the judgment should be vacated because the court misinterpreted certain provisions of the planned community declaration to which their property is subject, and because the court exceeded its authority by granting relief that the prevailing party, SNA, did not request. Although we concur with the trial court's analysis of the declaration, we find that its order granting relief to SNA should be modified. Therefore, we affirm in part, reverse in part and remand for further proceedings.

## I. Facts and Procedural History

{¶ 2} SNA is a nonprofit corporation formed to manage the Stonebridge Subdivision in Troy, a residential subdivision developed by Stonebridge Land Development, Inc. According to § 1.6 of the Declaration of Subdivision Establishing Covenants, Conditions, and Restrictions for the Project Known as Stonebridge Subdivision (the "Declaration"), SNA's "powers, rights, duties, and functions * * * shall be exercised by a [b]oard of [t]rustees selected solely by the [d]eveloper" until either "all [l]ots in the [s]ubdivision [have been sold] by the [d]eveloper," or the developer "relinquish[es] [its] right[]" to select the trustees, "whichever shall first occur." Appellants own a home in the subdivision; under § 1.2 of the Declaration, "[e]very owner of a [l]ot [in the subdivision] shall be a member" of SNA.

{¶ 3} Article IV, Section 1 of the Code of Regulations of Stonebridge Neighborhood

Association, Inc. (the "Regulations") states that "until [SNA's] first annual meeting," the Board of Trustees would consist of three persons identified in SNA's articles of incorporation, and that after the first annual meeting, the number of trustees would increase to five. The Regulations also state that the "first annual meeting shall be held within 180 days after the closing of the sale of all [l]ots in the [s]ubdivision" or "at such time as the [d]eveloper voluntarily relinquishes its control [over SNA] [at] a special meeting of [m]embers." Regulations § 3.1. Currently, SNA's board consists of five trustees.[1] *See* Dep. of Jerald Wayne Yost, Ex. 18, May 9, 2016.

{¶ 4} Article V, Section 1 of the Declaration instructs the Board of Trustees to create a committee, called the "Architectural Committee," for the purpose of ensuring "the general suitability of [new improvements] with [respect to] other construction in the [s]ubdivision" in terms of "harmony of external design, construction, and location * * *." Under § 5.3(a), a homeowner may not construct any improvements "until the construction plans and specifications" have been "approved in writing by the [c]ommittee." If the committee fails "to approve or disapprove any construction plans and specifications * * * within [30] days [of their submission], then the [committee's] approval will be deemed to have been given," but whether "by default or otherwise, [approval] shall be null and void unless construction is commenced within [180] days * * *." *Id.* at § 5.3(b). Because the Board of Trustees did not create an independent architectural committee, the board itself acts in the committee's place. *Id.* at § 5.1; Dep. of Aubrey Melvin Kemmer 38:6-39:6,

---

[1] This implies that all lots in Stonebridge have been sold or that Stonebridge Land Development, Inc. has voluntarily ceded control over SNA. *See* Dep. of Aubrey Melvin Kemmer 24:19-25:7, May 9, 2016; Dep. of Jerald Wayne Yost 10:2-10:14 and 16:10-17:1, May 9, 2016.

May 9, 2016.

{¶ 5} In February, 2014, Appellants requested permission from SNA to construct a swimming pool and a pool house on their property.   Appellants' Br. 4.   As part of their request, § 5.3(a) of the Declaration dictated that Appellants submit "construction plans and specifications showing the nature, kind, shape, size, height, materials, colors, and location [of the proposed improvements] in adequate detail as required by [SNA's Architectural] Committee."   Appellants appear to have complied with this requirement in making their request.   *See* Appellee's Br. 4.

{¶ 6} The Board of Trustees approved Appellants' submission of February, 2014, only to the extent of the proposed swimming pool; the board did not approve the pool house because it exceeded SNA's limitation on the size of outbuildings to 100 square feet.   Kemmer Dep., Ex. 3; Appellee's Br. 4; *see* Decision Granting in Part Pl.'s Mot. for Summ. J. 2 and 8, Nov. 3, 2016.   As a result, Appellants did not build a pool at that time. *See* Dep. of Amy L. Knapinski 64:13-66:7, July 29, 2016.   Instead, on July 27, 2015, Appellants submitted a second request for permission to build the pool and the pool house, apparently consisting of the same plans and specifications that they had submitted with their first request.   Decision Granting in Part Pl.'s Mot. for Summ. J. 2.   On or about August 2, 2015, the Board of Trustees again approved the plans for the pool and disapproved the plans for the pool house, which had not been changed to conform to the size limitation imposed by SNA.   *Id.*   As previously, Appellants did not begin work on the pool.   *See* A. Knapinski Dep. 64:13-66:7.

{¶ 7} Appellants revisited the issue at a meeting of the Board of Trustees held on September 8, 2015.   *Id.* at 2-3; Appellants' Br. 4-5; Appellee's Br. 4-5.   They gave the

board a revised, one-page rendering of the proposed pool and pool house taken from their earlier submissions, with handwritten notations indicating changes to the shape of the pool and to the position and the dimensions of the pool house; despite the revisions, the dimensions of the pool house still exceeded SNA's size limitation. Decision Granting in Part Pl.'s Mot. for Summ. J. 2-3; Kemmer Dep., Ex. 3; A. Knapinski Dep., Ex. U; Yost Dep., Ex. 18. The minutes of the meeting refer to a "request for an outbuilding" at Appellants' address and reflect that Appellants "asked about the process required to change the [b]y-laws" so that the pool house could be approved. *See* Yost Dep., Ex. 18. Although the board "passed a motion to put the request [to change the by-laws] to [a] vote" of the whole membership of SNA, the minutes include no record of any other action taken by the board in response.[2] Decision Granting in Part Pl.'s Mot. for Summ. J. 3.

{¶ 8} Undeterred, Appellants began construction during the last week of October, 2015. A. Knapinski Dep. 65:3-66:7. SNA filed a complaint against Appellants on December 18, 2015, setting forth causes of action under R.C. 5312.13 for injunctive relief and recovery of attorney's fees and costs.[3] On August 3, 2016, Appellants filed a motion for summary judgment, and SNA filed a reciprocal motion on September 21, 2016. The

---

[2] Appellants argue that they submitted a proposal at the meeting sufficient to implicate the provisions of § 5.3(a)-(b) of the Declaration, obligating the Board of Trustees to formally approve or disapprove the plans for the improvements within 30 days. *See* Appellants' Br. 5. SNA argues that Appellants sought only a change in the by-laws, which did not obligate the board to issue a formal approval or disapproval and did not implicate § 5.3(a)-(b). *See* Appellee's Br. 5-6. As well, SNA maintains that the board informed Appellants it wanted more information about the improvements before it would consider their proposal, and that Appellants effectively withdrew their proposal by ignoring the board's request. *Id.*

[3] The complaint does not refer expressly to the statute.

trial court overruled Appellants' motion and sustained SNA's motion in part—holding that SNA had demonstrated an entitlement to injunctive relief but had not provided sufficient evidence of its costs and attorney's fees.   Decision Granting in Part Pl.'s Mot. for Summ. J. 9-10.   Following a hearing on February 7, 2017, the court docketed a final judgment entry incorporating its decision on the parties' motions for summary judgment and awarding SNA $27,281.73, plus statutory interest.   Appellants timely filed their notice of appeal on May 15, 2017.[4]

## II. Analysis

{¶ 9} For their first assignment of error, Appellants contend that:

THE TRIAL COURT INCORRECTLY DENIED DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND GRANTED SUMMARY JUDGMENT IN FAVOR OF THE PLAINTIFF-APPELLEE BY INCORRECTLY INTERPRETING THE COVENANTS, CONDITIONS AND RESTRICTIONS ("CCRs") TO EFFECTIVELY ELIMINATE ONE OF THE PROVISIONS, WHICH LEADS TO ABSURD RESULTS NOT INTENDED BY THE LANGUAGE OF THE CCRs.

{¶ 10} Appellants argue that the trial court erred specifically by misinterpreting Articles V and VII of the Declaration.   *See* Appellants' Br. 8-10.   Citing § 5.1, 5.3(b) and 7.16(a), Appellants posit that 30 days after they provided a revised rendering of their proposed pool and pool house at the meeting of the Board of Trustees on September 8, 2015, they received permission by default because the board had not issued a written

---

[4] Appellants were not served with a copy of the trial court's final judgment entry until April 21, 2017.

disapproval in response. *See* Appellants' Br. 13.

{¶ 11} Restrictive covenants, like the Declaration, are "interpreted [according to the] general [principles of] contract" law. (Citations omitted.) *Grace Fellowship Church, Inc. v. Harned*, 2013-Ohio-5852, 5 N.E.3d 1108, ¶ 26 (11th Dist.); *see also MJW Enterprises, Inc. v. Laing*, 2d Dist. Montgomery No. 21253, 2006-Ohio-4011, ¶ 17. Thus, "when interpreting a restrictive covenant, a court's primary objective is to determine the parties' intent as reflected by the language used in the restriction." (Citations omitted.) *Capital City Cmty. Urban Redevelopment Corp. v. City of Columbus*, 10th Dist. Franklin No. 15AP-943, 2016-Ohio-8266, ¶ 23. Yet, because "Ohio law does not favor restrictions on the free use of land," when the language in a restriction "is unclear or ambiguous," a court "must choose the [interpretation that] result[s] in the least limitation" on use. (Citation omitted.) *MJW Enterprises*, 2006-Ohio-4011, ¶ 18. Otherwise, when the "language in a restriction is clear, a court must enforce the restriction, unless it violates law or public policy." (Citation omitted.) *Id.*

{¶ 12} The trial court found that the Declaration "establish[es] separate functions [for] the Board of Trustees and the Architectural Committee." Decision Granting in Part Pl.'s Mot. for Summ. J. 8. It determined that § 5.3(a)-(b) of the Declaration invests the Architectural Committee with the responsibility of evaluating the aesthetics of any proposed improvements, whereas it determined that § 7.16(a), which states that "[o]utbuildings and detached structures shall not be permitted unless approval, in writing, is obtained from [SNA] prior to commencement of any construction," invests the Board of Trustees with the responsibility of authorizing—or refusing to authorize—the actual construction of any improvements for which the Architectural Committee has approved

plans. *See* Decision Granting in Part Pl.'s Mot. for Summ. J. 7-8. On this basis, the court concluded that "[e]ven if the [rendering] submitted at the September [8, 2015,] meeting [of the Board of Trustees] could be construed as 'construction plans and specifications,' the failure of the [b]oard (acting as the Architectural Committee) to approve the plan[s] within [30] days only result[ed] in approval from the Architectural Committee," and not permission from the Board of Trustees to begin construction. *Id.* at 8.

{¶ 13} Appellants describe the trial court's analysis of the Declaration as "illogical, inconsistent, and potentially impossible," offering a series of comparisons to illustrate their point. For example, Appellants suggest the Declaration would allow "an entire house [to be built] if the A[rchitectural] C[ommittee] * * * does not respond in writing within 30 days of a plan submission, but an outbuilding must have written approval of the [committee] and * * * separate written [permission from] the Board [of Trustees], which is the same exact entity as the A[rchitectural] C[ommittee], even if * * * the [b]oard [takes] [five] or ten years" to grant permission. *See* Appellants' Br. 12. In short, Appellants insist that the "approval" of plans under § 5.3(b) satisfies the requirement in § 7.16(a) that "approval, in writing," be "obtained from [SNA] prior to [the] commencement" of work. *Id.*

{¶ 14} We concur with the trial court. Section 5.3(a) of the Declaration sets forth a specific description of the role of the Architectural Committee in reviewing plans for a proposed improvement, which is to evaluate "the nature, kind, shape, size, height, materials, colors and location," as well as "general suitability," of the improvement in comparison to "existing or proposed surrounding structures." Interpreted in conjunction with § 5.3(a), the scope of the committee's approval or disapproval under § 5.3(b) is

limited to the committee's aesthetic evaluation of a proposal. Section 7.16(a), however, requires permission from "the Association," rather than the Architectural Committee, "prior to [the] commencement of construction" of an outbuilding.

{¶ 15} Appellants' argument to the contrary has only superficial support in the text of the Declaration. Though homeowners must obtain approval in writing from SNA "prior to commencement" of construction of outbuildings, neither § 7.11 ("Completion of Construction") nor § 7.21 ("Size of Residence[s]") includes a similar requirement for houses. Even so, § 7.11 and 7.21 impose several specific restrictions that permit SNA to exercise at least as much control over the construction of houses as it has over the construction of outbuildings. *Compare* § 5.3(a) and 7.16(a), *with* § 7.11 and 7.21(a). Appellants, for that matter, overlook the contextual explanation for why the drafters of the Declaration would require only the Architectural Committee's approval of plans before authorizing the construction of a house, but for an outbuilding, the committee's approval as well as permission from the Board of Trustees.

{¶ 16} Section § 7.11(a) states that "[c]onstruction of a residence building on any [lot] is to be completed within two * * * years from the date of the original purchase [of the lot] from [Stonebridge Land Development, Inc.]" and "within one * * * year" from the date of commencement, and it adds that the developer "reserves the right to repurchase any lot in the [s]ubdivision upon which the construction of [a] residential building has not been completed" within the foregoing two-year period. The reference to the "date of the original purchase" along with the developer's reservation of the right to repurchase, appears to explain why the Declaration requires only the Architectural Committee's approval of plans before allowing construction of a house to begin—the developer wanted

to minimize the number of vacant lots in the subdivision at any given time, or in other words, to have the subdivision populated as quickly as possible. *See also*, *e.g.*, Declaration § 3.5 (stating that the developer "recognizes that until a sufficient number of [l]ots are conveyed to [o]wners, [SNA's] expenses * * * to maintain * * * [e]asement [a]reas may be greater than the amount assessed" under R.C. 5312.11 from existing owners, and indicating that the developer "may advance funds" to SNA in the form of a loan). Article V's treatment of outbuildings, on the other hand, appears to have been drafted in contemplation of the construction of subsequent improvements by owners already living in the subdivision, which likewise appears to explain why the Declaration requires two levels of authorization for outbuildings, but only one for houses.

{¶ 17} Read together, § 5.3 and 7.16 establish a two-step process of review for a proposed outbuilding in which two different groups, the Architectural Committee and SNA (acting through the Board of Trustees), issue authorizations for two distinct purposes: approval of the design, and permission to build. Although pursuant to § 5.1 the board also acted as the committee in this case, its failure to approve or disapprove Appellants' submission of September 8, 2015, could have resulted only in the default approval of the design of the pool and the pool house under § 5.3(b). Section 7.16(a), by contrast, includes no provision limiting the time in which the Board of Trustees must grant or deny permission to begin construction, meaning that permission to begin construction cannot be granted by default. Irrespective of the logic of this process vis-à-vis the processes applicable to other kinds of improvements, SNA appears to have devoted special attention to the construction of outbuildings owing to a perception that they tend to detract from the overall appearance and value of property in the subdivision. *See* Kemmer Dep.,

Exs. 3 and 12; Yost Dep. 74:3-74:20.

{¶ 18} Consequently, we find that the trial court's interpretation of § 5.1, 5.3 and 7.16 is an accurate reflection of the intent of the parties to the Declaration. Assuming for sake of argument that Appellants' submission to the Board of Trustees on September 8, 2015, constituted "plans and specifications" for purposes of § 5.3(a), we hold that default approval of the plans did not constitute authorization under § 7.16(a) for Appellants to proceed with construction. Appellants' first assignment of error is overruled.

{¶ 19} For their second assignment of error, Appellants contend that:

THE TRIAL COURT GRANTED INCORRECT RELIEF IN THE JUDGMENT ENTRY TO THE PLAINTIFF-APPELLEE TO HAVE THE POOL HOUSE TIMELY REMOVED FROM THE DEFENDANTS-APPELLANTS' PROPERTY WHEN THAT RELIEF WAS NEVER REQUESTED BY THE PLAINTIFF OR ADDRESSED BY THE PARTIES.

{¶ 20} Appellants challenge the trial court's order granting injunctive relief to SNA and requiring "the timely remov[al] from their property" of any "unauthorized outbuilding." Judgment Entry 1, Mar. 8, 2017; Appellants' Br. 20-21. They argue that the court's order is inequitable because the Board of Trustees "could have prevented the building of the pool house [by obtaining] a preliminary injunction, [yet the board] did nothing but watch the pool house be built." Appellants' Br. 24.

{¶ 21} We find that Appellants' argument has little merit. Regardless of whether the board could have sought injunctive relief before Appellants actually broke ground, Appellants themselves could, far more easily and cost effectively, have saved the "significant amounts of money [they spent] to build their pool house" simply by not starting

the work until their dispute with the board had been resolved, whether informally or through litigation. *Id.* As the trial court held, to "the extent that [the pool house] was voluntarily constructed" by Appellants "in the face of [the instant] litigation, any prejudice [to their interests] is of their own making." Judgment Entry 1.

{¶ 22} The trial court's order nevertheless fails to incorporate the economic-waste doctrine. To "determin[e] whether to grant an injunction, [a] court [uses] a balancing process to weigh the equities involved." (Citation omitted.) *Martin v. Lake Mohawk Prop. Owner's Ass'n*, 7th Dist. Carroll No. 04 CA 815, 2005-Ohio-7062, ¶ 50. In "weighing these equities, courts have refused to order destruction of costly structures as a matter of economic waste * * *." *Id.*, citing *Miller v. City of West Carrollton*, 91 Ohio App.3d 291, 632 N.E.2d 582 (2d Dist.1993).

{¶ 23} Here, the record is insufficient to allow an independent determination of whether modifying Appellants' pool house to conform to SNA's limitation on the size of outbuildings would result in less economic waste than removing the pool house altogether. Recognizing that an appellate court "will not disturb a decision of [a] trial court as to [its] determination of damages absent an abuse of discretion," we find that the trial court's order is arbitrary inasmuch as the court did not discuss the applicability of the economic-waste doctrine. *Roberts v. United States Fid. & Guar. Co.*, 75 Ohio St.3d 630, 634, 665 N.E.2d 664 (1996). The court should hold a hearing on remand to determine whether Appellants could cost-effectively conform their pool house to the standards imposed by SNA. Accordingly, Appellants' second assignment of error is sustained in part.

**III. Conclusion**

**{¶ 24}** We concur with the trial court's analysis of Articles V and VII of the Declaration, but we hold that the trial court arbitrarily ordered the destruction of Appellants' pool house without addressing the economic-waste doctrine in its final entry of March 8, 2017.   Therefore, we affirm the trial court in part, reverse in part, and remand the case to the court for further proceedings consistent with this opinion.

. . . . . . . . . . . .

FROELICH, J. and HALL, J., concur.

Copies mailed to:

Jonathan S. Zweizig
Jeremy M. Tomb
Patrick J. Janis
Hon. Christopher Gee